## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA
## JOHNSTOWN DIVISION

| | |
|---|---|
| MARTIN MURASKI and DEVIN YOUNG, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PENN HIGHLANDS HEALTHCARE, INC., <br><br> Defendant. | Civil Action No.  3:23-cv-135 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Martin Muraski and Devin Young ("Plaintiffs") hereby bring this action, on behalf of themselves and all persons and entities similarly situated, for violations of the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa. Cons. Stat. § 5701, *et seq*., against Defendant Penn Highlands Healthcare, Inc. ("Penn" or "Defendant"). Plaintiffs allege, based on information and belief and investigation by counsel except where specifically alleged on the basis of personal knowledge, as follows:

## NATURE OF THIS ACTION

1.    Plaintiffs bring this action for damages and other legal and equitable remedies resulting from the illegal actions of Penn in sharing tens of thousands of its patients' and website users' private medical and other personally identifiable information without notifying them and without obtaining their consent. By doing so,

Defendant violated the WESCA and invaded the privacy of thousands of Penn website visitors and its patients.

2.      Pennsylvania's WESCA offers a civil cause of action to "any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of" the statute against "any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication." 18 Pa. Cons Stat. § 5725(a). The WESCA is generally modeled after the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq.*, which provides uniform minimum protections for wire, electronic and oral communications, and authorizes states to adopt wiretap statutes that provide greater, but not lesser, protection than what is available under federal law.

3.      This is a class action brought against Defendant for its wiretapping of the communications of visitors to its website, www.phhealthcare.org. Defendant, through third-party vendor Google LLC ("Google"), installed a code, Google Analytics, on its website, which allows it to intercept and record its website users' communications without the users' knowledge or consent. As a result, Defendant permitted Google to intercept Penn website visitors' private medical and other personally identifiable information, including, but not limited to, the types of medical treatment website visitors seek and the names and specialties of the physicians with whom patients seek treatment, all for the purpose of gathering visitors' sensitive private medical and other personally identifiable information.

4.    By using Google Analytics to track its website visitors' private medical and personal information, Defendant targets advertising and other content on its website. Thus, Defendant profits from its unauthorized interception and disclosure of private medical and other personally identifiable information to Google. It does so at the expense of its website visitors' and patients' privacy and their statutory rights under the WESCA.

5.    Defendant chose to disregard Plaintiffs' and thousands of others' statutorily protected privacy rights by releasing their personal data, including sensitive private health information, to Google.

6.    Accordingly, Plaintiffs bring this action individually and on behalf of a class of all persons whose electronic communications were intercepted in Pennsylvania through the use of Penn's website and seek all civil remedies including, but not limited to, compensatory, statutory and/or punitive damages, injunctive relief and attorneys' fees and costs.

## **PARTIES**

7.    Plaintiff Martin Muraski is, and has been at all relevant times, a resident and citizen of the Commonwealth of Pennsylvania.

8.    Plaintiff Devin Young is, and has been at all relevant times, a resident and citizen of the Commonwealth of Pennsylvania.

9.    Defendant Penn Highlands Healthcare, Inc. is a corporation organized under the laws of Pennsylvania with its headquarters in DuBois, Clearfield County, Pennsylvania. Penn is an integrated health system located in northwestern

Pennsylvania with eight hospitals and more than 150 patient care locations. Penn employs approximately 6,600 employees and 827 physicians.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, involves more than 100 class members and is a class action in which some members of the class are citizens of states other than the state in which Penn is incorporated and has its principal place of business.

11.     Diversity jurisdiction exists because, upon information and belief, class members reside in Pennsylvania, Ohio, West Virginia, and New York while Penn is incorporated in and has its principal place of business in Pennsylvania.

12.     This Court has general personal jurisdiction over Penn because its principal place of business is within Pennsylvania. Additionally, this Court has specific personal jurisdiction over Penn because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in Pennsylvania.

13.     Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant resides in this District, transacts substantial business in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

4

## FACTUAL BACKGROUND

**I.     Penn's Use of Google Analytics**

14.     Penn's website sends patients' medical and other personal information to Google using Google Analytics, a web analytics service that allows website owners to track site visitors' actions in order to target such visitors with personalized advertisements.

15.     Google Analytics collects the Internet Protocol ("IP") addresses of individual Internet users in order to facilitate and track Internet communications.

16.     Simply put, Google can use the information that Penn is disclosing in order to identify a specific website user's actions on Penn's website.

17.     Google Analytics offers website owners, like Penn, an opt-in IP anonymization feature.

18.     According to Google, this feature is designed to help site owners comply with their own privacy policies and the recommendations of data protection authorities.

19.     If the IP anonymization feature is enabled by the website owner, an additional parameter is added to the communication between website visitors' computers and the Google Analytics server, defined as aip: 1 and depicted below.

20.     Accordingly, when the "aip" parameter does not appear, the IP address is not anonymized, thus enabling Google to identify website users' IP addresses and their online actions.



21.    Penn does not enable the IP anonymization feature on its website. This is demonstrated by the absence of the "aip" parameter in the website's code.



22.    By using the Google Analytics tool without the IP anonymization feature, Penn is sharing with Google its patients' online activity relating to their private medical treatment, along with patients' IP addresses, even when patients have not shared, nor have consented to share, such information.

## II.    How Private Patient Information is Shared by Penn

23.    Upon entering Penn's homepage website, users can select the "Find a Provider" button located on the top bar of the website.



24.    After selecting the "Find a Provider" button, users are directed to the "Find a Doctor" page, where they are able to search for a doctor by name, hospital, practice, specialty, location, type and gender, or choose a medical provider from the list provided.

25.     After selecting their desired search options and clicking the "Search" button, patients can scroll down the page and see search results from which they may select a doctor.




26.     Once a website user clicks the "Search" button, all of his or her submitted information is automatically sent directly to Google.

27.     As shown in the image below, Penn's site transmitted to Google sensitive private health and other personal information, including that the patient searched for a doctor who specializes in emergency medicine and is located in Huntingdon, Pennsylvania.

```
METHOD: GET +

URL
+ https://www.google-analytics.com/collect?v=1&_v=1&a=4550381908t
  =event&_s=5&dl=https%3A%2F%2Fwww.phhealthcare.org%2Fdoctor%3Fh%3Dtr
  ue%26DisplayName%3DBronia%26Agress&ul=en-us&de=UTF-8&dt=Find%20a%20
  Doctor%20%7C%20Penn%20Highlands%20Healthcare&sd=24-bit&sr=1536x864&
  vp=1519x746&je=0&ec=Form%20Submissions&ea=Find%20Doctor&el=Las
  t%20Name%3A%20Bronia%20Agress%20%7C%20Specialty%3A%26Emergency%26Me
  dicine%20%7C%26City%3A%20Huntingdon%20%7C%26Hospital%3A%26Huntingdo
  n&_u=CCCAgAAjAAAAAE~&jid=&gjid=&cid=1219409208.1648544976&tid=UA-49
  653500-1&_gid=561866904.1648544976&z=1934675234

HEADERS
+ accept:              image/avif,image/webp,image/apng,image/svg+xm
                       l,image/*,*/*;q=0.8
+ accept-encoding:     gzip, deflate, br
+ accept-language:     en-US,en;q=0.9
+ connection:          keep-alive
+ host:                www.google-analytics.com
+ referer:             https://www.phhealthcare.org/
  sec-ch-ua:           " Not A;Brand";v="99", "Chromium";v="99",
                       "Google Chrome";v="99"
  sec-ch-ua-mobile:    ?0
  sec-ch-ua-platform:  "Windows"
+ sec-fetch-dest:      image
+ sec-fetch-mode:      no-cors
+ sec-fetch-site:      cross-site
+ user-agent:          Mozilla/5.0 (Windows NT 10.0; Win64; x64)
                       AppleWebKit/537.36 (KHTML, like Gecko)
                       Chrome/99.0.4844.82 Safari/537.36
```

28.    After the website user selected the profile page of Dr. Bronia Agress,

Penn's site transmitted to Google the doctor's name that the user selected.



```
METHOD: GET +

URL
+ https://www.google-analytics.com/collect?v=1&_v=j96a=202623914
  6&t=pageview&_s=1&dl=https%3A%2F%2Fwww.phhealthcare.org%2Fdoctor%
  2Fagress-bronia-do1439&ul=en-us&de=UTF-8&dt=Bronia%20Agress%20%2
  C%20D0%26%7C%20Penn%20Highlands%20Healthcare&sd=24-bit&sr=1536x86
  4&vp=1519x746&je=0&_u=CCCAgAAj~&jid=&gjid=&cid=1219409208.1648544
  976&tid=UA-49653500-1&_gid=561866904.1648544976&z=146381294

HEADERS
+ accept:              image/avif,image/webp,image/apng,image/svg+
                       xml,image/*,*/*;q=0.8
+ accept-encoding:     gzip, deflate, br
+ accept-language:     en-US,en;q=0.9
+ connection:          keep-alive
+ host:                www.google-analytics.com
+ referer:             https://www.phhealthcare.org/
  sec-ch-ua:           " Not A;Brand";v="99", "Chromium";v="99",
                       "Google Chrome";v="99"
  sec-ch-ua-mobile:    ?0
  sec-ch-
  ua-platform:         "Windows"
+ sec-fetch-dest:      image
+ sec-fetch-mode:      no-cors
+ sec-fetch-site:      cross-site
+ user-agent:          Mozilla/5.0 (Windows NT 10.0; Win64; x64)
                       AppleWebKit/537.36 (KHTML, like Gecko)
                       Chrome/99.0.4844.82 Safari/537.36
```

29.    Penn's website also offers users the option to call a specific doctor from the doctor's online profile page.

30.    When users click the telephone number button to call the doctor's office, this information is immediately communicated and shared with Google.



31.    In addition, any information submitted by the patient through the search bar (e.g., doctor, specialty, type of treatment, etc.) located on the site's homepage is shared with Google, along with the patient's IP address.



## III. Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in Their Data, Including Their Sensitive Private Health Information

32.     Plaintiffs and class members have a reasonable expectation of privacy in their data, including sensitive medical and other personal information, communicated to Penn through its website.

33.     Penn is a covered entity under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1302, *et seq*. ("HIPAA"), which sets minimum federal standards for privacy and security of protected health information ("PHI").

34.     HIPAA defines "protected health information" as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

35.    Under 45 C.F.R. § 160.103, HIPAA defines "individually identifiable information" as a "subset of health information, including demographic information collected from an individual" that is:

    i.    created or received by a health care provider;

    ii.    relates to the past, present or future physical or mental health or condition of an individual; the provision or health care to an individual; or the past, present or future payment for the provision of health care to an individual; and

    iii.    either identifies the individual or there is a reasonable basis to believe the information can be used to identify the individual.

36.    HIPAA requires Penn to:

    i.    ensure the confidentiality, integrity and availability of all electronic PHI it creates, receives, maintains or transmits;

    ii.    identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI;

    iii.    protect against reasonably anticipated impermissible uses or disclosures of the PHI; and

    iv.    ensure compliance by its workforce to satisfy HIPAA's security requirements.

45 C.F.R. § 164.102, *et seq*.

37.    HIPAA further prohibits a healthcare provider from disclosing PHI to third parties, such as Google, except where an individual has expressly consented in advance to the disclosure or under certain HIPAA-compliant contracts. 45 C.F.R. § 164.502 & § 164.508.

38.    Upon information and belief, neither Penn nor Google obtained Plaintiffs' and class members' express consent to share their PHI, nor have Penn or Google entered into a HIPAA-compliant contract that would permit sharing such health information.

39.    In order to access care through Penn's website, Plaintiffs and class members must disclose PHI and they do so with the understanding that Penn is prohibited by HIPAA from disclosing it.

40.    Penn's legal obligations as a covered entity under HIPAA, in addition to the express and implied assurances of confidentiality it makes on its website, create a reasonable expectation in users that their communications through Penn's website and PHI will remain confidential.

41.    People who use Penn's online services reasonably expect that the PHI they communicate through Penn's website will remain private and not be shared with undisclosed third parties, including Google.

## IV.    Plaintiffs and Class Members Did Not Consent to Defendant's Collection or Use of Their Data

42.    Plaintiffs and Class members have no idea that Google collects and uses their sensitive PHI and other personal information at Penn's direction when they interact with Penn's website.

43.    There is no indication, let alone disclosure, that Google Analytics is embedded on Penn's website or that it collects users' sensitive PHI or other personal information.

44.     Penn's own "Notice of Privacy Practices" fails to acknowledge that it tracks website visitors' activities and shares their personal information with Google.[1]

45.     Whereas Penn's Notice of Privacy Practices describes how Penn may use and disclose PHI about its patients, it does not mention that it uses trackers, including Google Analytics, to track and automatically transmit communications to third parties.[2]

46.     Furthermore, Penn's Notice of Privacy Practices provides that "[w]e will not use or disclose medical information for the purpose of marketing non-PHH [Penn Highlands Healthcare] products or services without your authorization. We will not sell or distribute your medical information to third parties."[3]

47.     Penn's website does not have any terms of use, user agreement or any other provision that permits the disclosure of website users' PHI or other personal information to Google.

48.     While browsing Penn's website and scheduling pages, Plaintiffs and class members had no reason to visit Google's website to review its terms of use because they were unaware that Penn shared their sensitive PHI and other personal information with Google.

49.     Penn does not have an unlimited right to share Plaintiffs' and class members' data. Penn is a covered entity under HIPAA, which protects all

---

[1] *See* Penn's Privacy Policy, last updated Sept. 1, 2022, *available at* https://www.phhealthcare.org/patients-visitors/notice-of-privacy-practices (last accessed June 20, 2023).

[2] *Id.*

[3] *Id.*

electronically protected health information Penn "creates, receives, maintains, or transmits" in electronic form. *See* 45 C.F.R. § 160.103.

50.     Further, HIPAA does not permit the use or disclosure of PHI to Google for use in targeted advertising without Plaintiffs' and class members' express consent unless Penn and Google entered into a HIPAA-approved contract with Penn's website users. *See* 45 C.F.R. § 164.502 & § 164.508.

51.     Neither Penn nor Google obtained Plaintiffs' and class members' express consent to share their PHI, nor have Penn or Google entered into a HIPAA-compliant contract that would permit such sharing.

52.     Thus, Penn did not obtain consent to collect, use and store Plaintiffs' and class members' PHI and other personally identifiable information.

## V.     Penn Was Aware that Plaintiffs' and Class Members' Data Included Sensitive PHI

53.     Penn was well aware that placing Google Analytics on its website, including its appointment scheduling page, would result in the disclosure and use of Plaintiffs' and class members' sensitive PHI and other personal information.

54.     By design of Google Analytics, *i.e.*, sending all interactions on a website to Google, Penn was well aware that its website users' PHI and other personal information would be sent to Google when they made appointments or otherwise interacted with the website.

## VI.  Plaintiffs and Other Class Members Suffered Harm as a Result of the Unlawful Disclosure of Their Sensitive PHI

55.    Businesses have been built around the collection of personal data as "data is widely considered to be among the world's most valuable resources" because of the potential revenue and business value it can provide. Personal data has been recognized as "a valuable commodity, similar to commodities like oil and gold."[4]

56.    The Federal Trade Commission ("FTC") has identified data collected about a person's precise location and information about their health as the most sensitive categories of data collected. Standing alone, these data points "pose an incalculable risk to personal privacy," but when technology companies collect the data, combine it and sell or monetize it, this amounts to an "unprecedented intrusion" and creates a "new frontier of potential harms to consumers."[5]

57.    For example, the FTC recently settled a lawsuit against Flo Health, alleging that the company shared sensitive health information with Google and Meta collected from its period and fertility tracking app, despite promising to keep this information private. The FTC warns that the misuse of such health information, including reproductive health data, exposes consumers to significant harm because: (i) criminals can use the health data to facilitate phishing scams or commit identity

---

[4] *See* Vijay Cherukuri, *Data: The Most Valuable Commodity for Business*, KD Nuggets (Mar. 1, 2022), *available at* https://www.kdnuggets.com/2022/03/data-valuable-commodity-businesses.html (last accessed June 20, 2023).

[5] Kristen Cohen, Location, health and other sensitive information: FTC committed to fully enforcing the law against illegal use of sharing of highly sensitive data, FTC (July 11, 2022), *available at* https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal (last accessed June 20, 2023).

theft; (ii) stalkers or other criminals can use the data to inflict physical and emotional injury; and (iii) the exposure of health information and medical conditions can subject people to discrimination, stigma, mental anguish and other serious harms.[6]

58.    Chris Bowen, the Chief Privacy and Security Officer for ClearData, explained that health information is so valuable because "[y]ou can build [an] entire human persona around a health record. You can create or seek medical treatment, abuse drugs, or get prescriptions."[7]

59.    This is part of the reason why healthcare data may be valued at up to $250 per record on the black market.[8]

60.    However, personal data is not just valuable to criminals. It is common knowledge that there is an economic market for consumers' personal data, including the PHI Penn collected from Plaintiffs and other members of the class.

61.    Healthcare providers, such as Penn, "sit on treasure troves: a stockpile of patient health data stored as electronic medical records."[9] These "files show what

---

[6] *Id.*

[7] Will Maddox, Why Medical Data is 50 Times More Valuable Than a Credit Card, DMagazine (Oct. 15, 2019), *available at* https://www.dmagazine.com/healthcare-business/2019/10/why-medical-data-is-50-times-more-valuable-than-a-credit-card/ (last accessed, June 20, 2023).

[8] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data*, SecureLink June 30, 2021), *available at* https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (last accessed, June 20, 2023).

[9] Nicole Westman, *Hospitals are selling treasure troves of medical data – what could go wrong?*, The Verge (June 23, 2021), *available at* https://www.theverge.com/2021/6/23/225473 97/medical-records-health-data-hospitals-research (last accessed June 20, 2023).

people are sick with, how they were treated, and what happened next."[10] Taken together, they're hugely valuable resources for medical discovery."[11]

62.    When healthcare providers de-identify records by removing identifying information such as names, locations and phone numbers, healthcare providers can sell the data to partners for research.

63.    Unsurprisingly, healthcare groups have taken advantage of de-identifying medical records. For instance, the Mayo Clinic in Rochester, Minnesota is working with a startup company to develop algorithms in order to diagnose and manage conditions based on health data.[12]

64.    Fourteen U.S. healthcare systems have formed a company to aggregate and sell de-identified data.[13]

65.    One hospital chain has also reached an agreement with Google to use patient data to develop healthcare algorithms.[14]

66.    Given the significant monetary value of PHI, Penn has deprived Plaintiffs and the class members of the economic value of their sensitive PHI by acquiring and disclosing such data without providing proper consideration for Plaintiffs' and class members' property.

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] Nicole Westman, *Google to use patient data to develop healthcare algorithms for hospital chain*, The Verge (May 26, 2021), *available at* https://www.theverge.com/2021/5/26/22454817/google-hca-patient-data-healthcare-algorithms (last accessed June 20, 2023).

## VII.    Plaintiff Martin Muraski's Experience with Penn's Website

67.    Plaintiff Martin Muraski is an adult citizen and visited Penn's website on numerous occasions over the two years prior to filing this action.

68.    Mr. Muraski has accessed Penn's website both on his cell phone and computer web browser. Upon information and belief, he started using Penn's website in 2015.

69.    Mr. Muraski used Penn's appointment scheduling page, including the "Find a Doctor" feature, and entered sensitive medical and other personal information when scheduling appointments for medical treatment, including the types of medical treatment he seeks through Penn, the type of provider (i.e., physician, nurse practitioner, etc.), specialty and name of the providers with whom he seeks treatment with, the locations of the Penn facilities he wishes to go to and if he searches for Penn providers by a specific gender. When using the scheduling page, he was also sharing his IP address.

70.    Mr. Muraski has accessed and used the Penn scheduling page, including the "Find a Doctor" feature, on Penn's website numerous times, with the last time in 2023.

71.    Mr. Muraski has also used the search bar on Penn's website, and he entered sensitive medical and other personal information when using it to find an appropriate medical provider, including his medical diagnosis, conditions and symptoms. When using the search bar, he was also sharing his IP address.

72.    Mr. Muraski has accessed and used the Penn search bar on Penn's website numerous times, with the last time as recent as 2023.

73.    Unbeknownst to Mr. Muraski, Penn allowed Google to have access to the appointment scheduling page and search bar when he used them.

74.    Google utilized this access to surreptitiously gather Mr. Muraski's sensitive PHI and other personal information.

75.    Mr. Muraski did not consent to the interception of his electronic communications with Penn nor the disclosure to Google.

76.    When Mr. Muraski visited Penn's website, Google collected his PHI and other personal information from Penn and had already collected some or all of his personal information from other websites in its wiretap network.

77.    Thus, Google was able to link Mr. Muraski's previous browsing activity on other websites and his intercepted activity on Penn's website to his personally identifiable information, revealing an enormous amount of private information about him.

78.    In order to receive the best care from Defendant and its healthcare providers, Mr. Muraski is required to use the Penn website because it is the only centralized location where he can research the various treatment options and providers offered by Penn related to his specific healthcare needs.

## VIII.  Plaintiff Devin Young's Experience with Penn's Website

79.    Plaintiff Devin Young is an adult citizen and he visited Penn's website on numerous occasions over the two years prior to filing this action.

80.    Mr. Young has accessed Penn's website both on his cell phone and computer web browser. Upon information and belief, he started using Penn's website in 2013.

81.    Mr. Young used Penn's appointment scheduling page, including the "Find a Doctor" feature, and entered sensitive medical and other personal information when scheduling appointments for medical treatment, including the types of medical treatment he seeks through Penn, the type of provider (i.e., physician, nurse practitioner, etc.), specialty and name of the providers with whom he seeks treatment with, the locations of the Penn facilities he wishes to go to and if he searches for Penn providers by specific gender. When using the scheduling page, he was also sharing his IP address.

82.    Mr. Young has accessed and used the Penn scheduling page, including the "Find a Doctor" feature, on Penn's website numerous times, with the last time in 2023.

83.    Mr. Young has also used the search bar on Penn's website, and he entered sensitive medical and other personal information when using it to find an appropriate medical provider, including his medical diagnosis, conditions and symptoms. When using the search bar, he was also sharing his IP address.

84.    Mr. Young has accessed and used the Penn search bar on Penn's website numerous times, with the last time as recent as 2023.

85.    Unbeknownst to Mr. Young, Penn allowed Google to have access to the appointment scheduling page and search bar when he used them.

86.    Google utilized this access to surreptitiously gather Mr. Young's sensitive PHI and other personal information.

87.    Mr. Young did not consent to the interception of his electronic communications with Penn nor the disclosure to Google.

88.    On information and belief, when Mr. Young visited Penn's website, Google collected his PHI and other personal information from Penn and had already collected some or all of his personal information from other websites in its wiretap network.

89.    Thus, Google was able to link Mr. Young's previous browsing activity on other websites and his intercepted activity on Penn's website to his personally identifiable information, revealing an enormous amount of private information about him.

90.    In order to receive the best care from Defendant and its healthcare providers, Mr. Young is required to use the Penn website because it is the only centralized location where he can research the various treatment options and providers offered by Penn related to his specific healthcare needs.

## CLASS ALLEGATIONS

91.    Plaintiffs bring this action both on behalf of themselves and all others

similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a),

(b)(2) and (b)(3). The Class is defined as follows:

> All individuals who visited the Penn website in the last two years and had their private medical and other personal information shared with Google without providing consent.

> Specifically excluded from this Class are Defendant, its officers, directors or employees, any entity in which Defendant has a controlling interest and any affiliate, legal representative, heir or assign of Defendant. Also excluded from this Class are any judicial officers presiding over this action, the members of the judicial officer's immediate family and staff and any juror assigned to this action.

92.    Certification of Plaintiffs' claims for class-wide treatment is appropriate

because Plaintiffs can prove the elements of their claims on a class-wide basis using

the same evidence as would be used to prove those elements in individual actions

alleging the same claims.

93.    <u>Class Identity</u>: The Class is readily identifiable and one for which

adequate records exist.

94.    <u>Numerosity</u>: The members of the Class are so numerous that their

individual joinder is impractical, and the Class is reasonably believed to include tens

of thousands of persons. Further, the size and relatively modest value of the claims

of individual Class members renders joinder impractical. The precise number or

identification of Class members is presently unknown to Plaintiffs but may be

ascertained from Penn's and third parties' records. Class members may be notified of the pendency of this action by mail, email, Internet postings and publication. Upon information and belief, there are tens of thousands of Class members.

95. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class members because Plaintiffs are individuals who had their private health and other personal information collected, captured, received or otherwise obtained and/or stored by Google without their consent. Plaintiffs' claims arise from the same common course of conduct, give rise to the same claims of injury and seek the same relief as those of the other Class members.

96. <u>Common Questions Predominate</u>: Questions of law and fact common to the Class, which generate common answers, include, but are not limited to:

    a.    Whether Plaintiffs and Class Members had a reasonable expectation of privacy in their PHI and other personal information communicated to Penn;

    b.    Whether Google Analytics is designed to send individually identifiable information submitted on Penn's website to Google;

    c.    Whether Penn violated Plaintiffs' and Class members' privacy rights;

    d.    Whether Penn shared its patients' PHI and other personal information without Plaintiffs' and Class members' consent;

    e.    Whether Penn's actions violated the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5701, *et seq*.;

    f.    Whether Plaintiffs and the Class members are entitled to injunctive and equitable relief; and

g.    Whether Plaintiffs and the Class members are entitled to actual, statutory, punitive or other forms of damages and other monetary relief.

97.    These and other questions of law and fact common to all members of the Class predominate over questions affecting only individual members of the Class.

98.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class because Plaintiffs' interests are aligned with, and are not antagonistic to, those of the other Class members. Plaintiffs have retained counsel competent and experienced in the prosecution of complex and class action litigation to represent them and the Class.

99.    <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons: (i) individual joinder of all Class members is impractical; (ii) prosecution as a class action will eliminate the possibility of duplicative litigation; (iii) prosecution of separate actions by individual Class members would create the risk of inconsistent or varying decisions and adjudications, creating uncertain and potentially incompatible standards for adjudicating the claims and defenses asserted in this action; (iv) the relatively small amount of damages suffered by individual Class members, when compared to the expense and burden of individual prosecution of their individual claims, preclude feasible and practical individual actions to seek redress for the violations alleged; and (v) individual litigation would greatly magnify the delay and expense to all parties and to the court system. For these reasons, a class action will reduce case management difficulties and provide the benefits of

unitary adjudication, economy of scale and comprehensive supervision by a single court.

100.    In addition, Penn has acted on grounds generally applicable to the Class, making final injunctive relief appropriate for the Class as a whole.

**COUNT I**
**Violation of Pennsylvania Wiretapping**
**and Electronic Surveillance Control Act**
**18 Pa. Cons. Stat. § 5701, *et seq*.**
**(On Behalf of Plaintiffs and the Class)**

101.    Plaintiffs restate and reallege all paragraphs of this Complaint as though fully set forth herein.

102.    The Pennsylvania Wiretapping and Electronic Surveillance Control Act prohibits:

> i.    the interception or procurement of another to intercept any wire, electronic or oral communication;

> ii.    the intentional disclosure of the contents of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication; and

> iii.    the intentional use of the contents of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication.

18 Pa. Cons. Stat. § 5703.

103.    Any person who intercepts, discloses, uses or procures any other person to intercept, disclose or use a wire, electronic or oral communication in violation of the Act is subject to a civil action for:

    i.    actual damages, not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher;

    ii.    punitive damages; and

    iii.    reasonable attorneys' fees and other litigation costs incurred.

18 Pa. Cons. Stat. § 5725(a).

104.    "Intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

105.    "Contents," when "used with respect to any wire, electronic or oral communication," is defined as "any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

106.    "Person" is defined as "any individual, partnership, association, joint stock company, trust, or corporation." 18 Pa. Cons. Stat. § 5702.

107.    "Electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

108.    Plaintiffs and Penn are "persons" within the meaning of WESCA. 18 Pa. Cons. Stat. § 5702.

109.    Google Analytics, and its code, is an "electronic, mechanical or other device" within the meaning of WESCA that is used for the "acquisition of the contents of any wire, electronic, or oral communication." 18 Pa. Cons. Stat. § 5702.

110.  Plaintiffs' and Class members' intercepted PHI and other personal information constitute the "contents" of "electronic communication[s]" within the meaning of WESCA. *See Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 132 (3d Cir. 2022). There is no direct-party exception to WESCA. *Id*. at 129, n.5.

111.  Every Penn facility is located in Pennsylvania, Penn is incorporated in Pennsylvania and has its principal place of business in Pennsylvania.

112.  Penn's website was developed and is hosted by Mojo Active, Inc., a Pennsylvania corporation with its principal place of business in Pennsylvania.

113.  Penn procured Google to automatically spy on, and intercept, its patients' PHI and other personal information communicated through the Penn "Find a Doctor" scheduling page and other areas of its website in real time.

114.  To facilitate this wiretap, Penn installed Google Analytics code on its website and the "Find a Doctor" scheduling page. The Google Analytics code instructed Penn's website to intercept users' PHI and other personal information entered while navigating the website and to send that information to Google.

115.  While on the "Find a Doctor" scheduling page, Plaintiffs' and Class members' electronic communications containing their PHI and other personal information were intercepted during or shortly after transmission. These intercepted communications occurred in Pennsylvania.

116.  Plaintiffs and Class members did not consent to having their PHI and other personal information wiretapped or intercepted.

117.    Plaintiffs and Class members had a justified expectation under the circumstances that their electronic communications would not be intercepted.

118.    Penn installed Google's code on its website. Because the code is secret and encrypted, Plaintiffs and Class members were not aware that their electronic communications were being intercepted.

119.    Penn's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiffs and Class members without their consent as they interact with Penn's "Find a Doctor" scheduling page and other areas of the website.

120.    Accordingly, Plaintiffs, on behalf of themselves and the Class, seek:

    i.    Declaratory relief;

    ii.    Injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by enjoining Defendant from continuing the unlawful conduct as set forth herein;

    iii.    Actual, consequential, statutory and/or punitive damages;

    iv.    Reasonable attorney's fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Martin Muraski and Devin Young, on behalf of themselves and the proposed Class, respectfully request that this Court enter an order:

A.    Certifying this case as a class action on behalf of the Class defined above (or on behalf of any other class the Court deems appropriate);

B.    Appointing Plaintiffs as representatives of the Class and their undersigned attorneys as Class Counsel for the Class;

C.      Declaring that Penn's acts and omissions, as set forth above, violated the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5701, *et seq.*;

D.      Awarding statutory, actual, compensatory, consequential, punitive and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

E.      Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class, including, *inter alia*, requiring Defendant to comply with the Pennsylvania Wiretapping and Electronic Surveillance Control Act;

F.      Awarding Plaintiffs and the Class their reasonable attorneys' fees and costs and other litigation expenses;

G.      Awarding Plaintiff and the other Class members pre- and post-judgment interest, to the extent allowable; and

H.      Awarding such other and further relief as the Court may deem just and proper under the circumstances.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Respectfully submitted,

Dated:  June 21, 2023

/s/Jonathan K. Cohn

Jonathan K. Cohn, Esquire
PA ID No. 92755
jcohn@stembercohn.com
Maureen Davidson-Welling, Esquire
PA ID No. 206751
mdw@stembercohm.com
STEMBER COHN &
    DAVIDSON-WELLING, LLC
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
T.: (412) 338-1445

Klint L. Bruno, Esquire
kb@brunolawus.com
Michael L. Silverman, Esquire
msilverman@brunolawus.com
William D. Kelly, Esquire
wk@brunolawus.com
(*pro hac vice applications forthcoming*)
THE BRUNO LAW FIRM, LLC
205 North Michigan Avenue, Suite 810
Chicago, IL 60601
T.: (312) 321-6481

*Attorneys for Plaintiffs and Class*